834 So.2d 243 (2002)
Jerry Ann WINTERS, Appellant,
v.
FLORIDA BOARD OF REGENTS and University Of South Florida, Appellees.
Nos. 2D01-42, 2D01-4363.
District Court of Appeal of Florida, Second District.
November 8, 2002.
Rehearing Denied January 21, 2003.
*244 Mark F. Kelly, Tampa, for Appellant.
John W. Campbell, Michael D. Malfitano, and Matthew S. Effland of Costangy, Brooks & Smith, LLC, Tampa, and R.B. Friedlander, University of South Florida, Office of the General Counsel, Tampa, for Appellees.
CASANUEVA, Judge.
Jerry Ann Winters challenges the final agency order issued by the University of South Florida ("USF"), which upheld her dismissal as the head coach of USF's women's basketball team. Ms. Winters asserts that USF, as the agency,[1] erred, first, in rejecting the finding of the administrative law judge ("ALJ") that she did not retaliate against a player who had filed a complaint of racial discrimination against her and, second, in finding that USF improperly terminated her employment on the ground that she breached a clause of her contract by submitting an affidavit claiming that she did not know of the racial discrimination claim against her. Ms. Winters' contention on retaliation has merit, *245 and we reverse on that ground. We hold, however, that the agency did not err when it rejected the ALJ's legal conclusion that the false affidavit did not constitute a ground for termination. The final agency order held that USF could determine, as a matter of policy, that Ms. Winters had breached her contract, a conclusion that we affirm. Because we have upheld only one aspect of the final order, however, we remand for USF to reconsider whether to sustain Ms. Winters' termination on that sole ground.

The Agency Proceedings and Recommended Order
After USF decided to terminate Ms. Winters as head women's basketball coach, she petitioned for formal administrative review, and she identified the disputed issue as whether cause as defined in her USF employment contract existed and, if such cause existed, whether the cause warranted the termination of her employment contract. The ALJ's amended notice of hearing framed the issue similarly: whether cause existed to terminate petitioner's employment with USF. After a de novo hearing on this issue, the ALJ made certain findings of fact, as recited below. USF then, sitting in its review capacity as the agency, rejected many of the crucial factual findings as well as the legal conclusions grounded upon those findings.
For twenty-four years Ms. Winters, a Caucasian female, had served as a head coach for women's basketball teams. During that time players from different ethnic backgrounds had played on her teams, and before the allegations in this case arose Ms. Winters had never been charged with discriminatory conduct as a coach.
In April 1999, Melikki Dione Smith, an African-American member of USF's women's basketball team, filed a complaint with USF's Office of Equal Opportunity Affairs ("EOA") against Ms. Winters, alleging that the coach discriminated against players because of race. The complaint triggered an inquiry into the allegations.
Following the filing of the EOA complaint, Ms. Winters met with her players individually, as was her practice at the conclusion of every season, to assess team and individual performance. Most of the player-coach meetings for the 1998-99 team concluded within an hour. However, Ms. Smith's meeting lasted several hours (charged in the final agency order to be over four hours), and was attended by an assistant coach and by Mr. Hiram Green, a USF athletic department employee. With her players' consent, Ms. Winters made tape recordings of all meetings, as did Ms. Smith of her individual session. Ms. Winters' recordings were admitted as evidence, but the ALJ found their general quality to be very poor; many of the remarks were unintelligible. Ms. Smith's recordings were neither offered nor admitted into evidence by either party.
Based on a review of the tape recordings and other evidence of the meetings, the ALJ found that Ms. Winters was aware during the April 1999 meetings that allegations of discrimination because of race had been made by some of the African-American players, including an allegation in a letter that Ms. Smith had written to USF officials regarding the situation as she perceived it. No evidence existed suggesting that any player was unable either to leave or terminate her postseason interview, during which the African-American players raised issues with Ms. Winters regarding game playing time, practice situations, and team travel accommodations.
As for the Winters/Smith meeting, the ALJ characterized the interview as a "frank discussion between the coach and the player about the problems perceived by each," rather than as evidence of "some type of disparate treatment." Ms. Winters *246 asked Ms. Smith about the alleged discriminatory conduct, and she responded to each proffered allegation. In a discussion of team discipline, the coach explained that because players are subordinate to the coaches, it was unacceptable for Ms. Smith to shout back at an assistant coach who had yelled at her.
Although the events of the following season established that it was difficult for Ms. Winters and Ms. Smith to work together, the 1999-2000 women's basketball regular season and Conference USA tournament "passed without major incident." As the team returned to USF following its last game of the season in March 2000, however, events took a significant turn. Various team members sang songs on a shuttle bus from the Tampa airport to the campus, creating verses as they sang. Although there was some dispute as to the exact words, Ms. Smith composed and sang a lyric to the effect of "we ain't gonna have no coach no more." Suddenly the formerly good mood on the bus turned tense. Ms. Winters interpreted the lyric as an insult; some players thought that the song reflected Ms. Smith's lack of respect for the coach.
On April 10, 2000, Ms. Winters met with Ms. Smith to ask for an explanation of the meaning of the verse. Ms. Smith first questioned Ms. Winters' ability to hear the lyric, then denied singing it, and finally offered a nonsensical explanation. During that meeting Ms. Smith also challenged the coach's authority and criticized her for failing to call a team meeting. Because Ms. Smith's reason for singing the song was unacceptable and because she was displeased with Ms. Smith's criticism, Ms. Winters advised her that if she could not provide a rational explanation for the lyric, Ms. Smith would be removed from the team. Unlike the interview following the preceding season, only the coach and player were present at this meeting.
The next day Ms. Smith and Ms. Winters encountered each other at the USF basketball court. Ms. Winters restated her decision to dismiss Ms. Smith from the team unless an explanation for the lyric was forthcoming, but Ms. Smith never provided one. Later, Ms. Smith called a meeting with other players and told them that she had been dismissed from the team for her behavior on the bussinging the lyric.[2]
On April 26, 2000, Ms. Smith filed an "allegation" of retaliation by Ms. Winters with USF's EOA office. The "allegation" was followed by the filing of a formal complaint on August 28, 2000, which precipitated an investigation and ultimately the issuance of a final investigative report to which Ms. Winters was asked to respond. Specifically, the allegations were that Ms. Smith had participated in a 1999 investigation conducted by Hiram Green regarding alleged race discrimination by Ms. Winters; that the coach knew that Ms. Smith had participated in the investigation; that Ms. Smith was dismissed from the basketball team on April 10, 2000; and that Ms. Smith was dismissed because of her participation in the 1999 investigation conducted by Mr. Green.
Ms. Winters' affidavit of response to the allegations is crucial to this proceeding. In it she stated that she did not know whether Ms. Smith participated in the investigation nor did she know which team members participated in the investigation; that Ms. Smith was dismissed from the basketball team for her behavior on the bus trip and her conduct in the subsequent meeting to discuss the lyrics she sang; *247 and that Ms. Smith's dismissal from the team had nothing to do with her participation in any investigation.
At the hearing before the ALJ, USF contended that Ms. Winters was dishonest because she was in fact aware that Ms. Smith was one of the players who had filed a complaint against her in April 1999. Her affidavit of response thus formed the grounds for termination of her USF contract under section 8.c.(5), which defines "cause" as "[a]ny fraud or dishonesty of Coach while performing the duties required by this Agreement, including but not limited to, falsifying, altering or otherwise fraudulently preparing any document(s) or record(s) of, or required by, the University...." On this issue, the ALJ found as fact that the "weight of the evidence establishes that Winters was aware in April 1999 that Smith had written a letter to USF officials regarding the alleged discrimination. It is reasonable to infer that Winters suspected that Smith participated in the investigation." Based upon a review of the tapes from the April 1999 meetings, the ALJ also found that "Winters was aware during the April 1999 meetings that some of the African-American players were alleging discrimination because of race" and that Ms. Winters was "aware that Smith had written a letter to USF officials about the situation, although it is unclear whether Winters knew Smith had officially filed a discrimination complaint."
The final concern in the agency proceeding was the situation surrounding the issuance of the EOA final investigative report. The report contained unsworn statements made to the EOA investigator, Camille Blake, by numerous witnesses including Hiram Green and Ms. Smith. The ALJ concluded that Ms. Blake followed the appropriate EOA procedure in compiling the report, but her testimony at the hearing concerning the report was rife with uncorroborated hearsay. Although the report was admitted into evidence in the hearing before the ALJ, neither Ms. Smith nor Mr. Green was called to offer sworn testimony,[3] and the ALJ accorded it no weight. Upon review, however, the agency concluded that it was admissible evidence.
Based upon the foregoing findings, the ALJ concluded that when Ms. Winters dismissed Ms. Smith from the team, she had not done so in retaliation for Ms. Smith's earlier filing of a complaint alleging racial discrimination. Thus, USF had no cause to fire Ms. Winters based on retaliation. The second chargethat Ms. Winters acted dishonestlywas more problematic. As noted above, the ALJ found that Ms. Winters was aware that Ms. Smith had written a letter alleging racial discrimination, and from that knowledge inferred that Ms. Winters knew Ms. Smith had participated in the EOA investigation. The fact that Ms. Winters stated in her response affidavit that she was unaware of the charge was not of paramount significance, in the ALJ's view. The ALJ found that there was nothing to refute Ms. Winters' testimony that she responded as directed by her legal counsel, and he concluded that her written response was not an attempt to mislead USF officials or to otherwise deceive them. The ALJ concluded: "There is no evidence that the *248 written response, without evidence of other cause, is sufficient to warrant termination of the head coaching agreement between Winters and USF."

The Final Agency Order
After the recommended order was issued, USF filed a number of written exceptions. At the outset, USF argued that the ALJ had misstated the ultimate issue in the case, which was whether there was cause warranting termination of the coaching agreement based on Ms. Winters' breach of contract. The retaliation and dishonesty issues, USF claimed, were elements of proof, but by framing the issue as whether USF was justified in terminating Ms. Winters on one or both of those grounds, the ALJ had imposed an improper burden of proof on USF. The agency in its final order granted this first and crucial exception and declared that both sides had agreed in a prehearing stipulation that the narrow issue was whether USF had sufficient cause, as the term is defined in Ms. Winters' employment contract, for terminating her employment.
A number of other exceptions dealt with the ALJ's findings of fact concerning the postseason interviews. The agency modified the ALJ's findings about the length of the Winters/Smith meeting and declared that it lasted four and a half hours. Overall, the agency concluded, the interviews of those African-American players who complained of racial discrimination were longer than the others and were a form of retaliation for having filed those complaints. Furthermore, from its full review of the record and all of the tape recorded interviews, the agency concluded that the evidence revealed "that [Ms. Winters'] actions towards Ms. Smith were unreasonablenot so much for just what was said as for how [Ms. Winters] said it, and for how long." From this disparate length of the Winters/Smith interview compared with the interviews of other players, together with the unreasonable nature of the interview, the agency found that Ms. Winters acted unreasonably toward Ms. Smith in a desire to retaliate against her.
USF also challenged the findings in the recommended order concerning Ms. Winters' alleged falsification of a document provided to the University as part of the ongoing investigation. In its final order the agency found that the wording of the recommended order on that issue was equivocal and improperly blended findings of fact and a conclusion of law. The agency agreed with the finding that it was reasonable to infer that Ms. Winters suspected that Ms. Smith participated in the investigation but rejected the conclusion that it was illogical to conclude that Ms. Smith's answers were intended to conceal information from or to deceive USF officials. The agency characterized this as a legal conclusion and decided to disregard it.
Finally, the agency reviewed the record and found that Ms. Winters' written response to the questions posed to her during the EOA hearing were "flatly inconsistent with" other statements she made in the tape recorded interviews and in other EOA investigative interviews and that this discrepancy resulted from Ms. Winters' intentional acts, not from negligence or mistake. From that point, it became a matter of policy within the expertise of the agency, not the ALJ, to decide whether the intentional misstatements were sufficient grounds for Ms. Winters' termination. Ultimately the agency concluded, from a full review of the record including the EOA final investigative report, that Ms. Winters engaged in retaliation and that she breached the trust expected of the head coach of the women's basketball team. On those grounds the agency concluded that cause *249 existed for USF to terminate Ms. Winters' contract.

Discussion and Decision
This appeal presents three primary issues: whether there was retaliation as found by the agency; whether Ms. Winters was dishonest in her responses as found by the agency; and, if the answer to either or both of those issues is affirmative, whether either or both constitute cause for termination.
At the outset we note the limited scope of our review, which is provided by section 120.68(1), Florida Statutes (2000), for any "party who is adversely affected by final agency action." A court is empowered to set aside agency action where the agency's action is dependent on findings of fact that are not supported by competent, substantial evidence in the record of the hearing, or where the agency has erroneously interpreted a legal proposition, and a correct interpretation would compel a particular action. § 120.68(7).
Beginning with the retaliation claim, we reject the agency's assertion that the issue is whether it had good cause to believe there had been retaliation. While that standard may support the commencement or continuation of an internal investigation, it does not constitute a basis for termination of the employment contract at issue here. Accordingly, the ALJ did not err in setting forth the issue for resolution as "whether there was cause under the terms of Winters' contract of employment with USF to permit USF's termination of the contract."
Because the agency rejected the ALJ's conclusion that the EOA investigative report should be disregarded, we next address the extent to which that report may be considered as evidence. The statements of the various witnesses in the EOA investigation were not made under oath. Before testifying in either a judicial or administrative hearing a witness is required to "declare that he or she will testify truthfully." § 90.605(1), Fla. Stat. (2000). The general rule is that an unsworn witness is not competent to testify. Houck v. State, 421 So.2d 1113 (Fla. 1st DCA 1982).
A further infirmity was that the report consisted almost entirely of inadmissible hearsay. Its purpose was not to prove that the university followed proper protocol but rather to establish that its employee engaged in allegedly impermissible retaliatory behavior. Thus, it was offered to prove the truth of the matter being asserted by the university, and the many out-of-court statements it contained were made by declarants not present at the administrative hearing for cross-examination. Because the report was both unsworn and hearsay, the ALJ committed no error in failing to admit or to consider its contents. Conversely, the agency erred by concluding that the report constituted competent evidence upon which it could base its conclusion.
In determining whether prohibited retaliation occurred, federal judicial opinions shed light on the issue of whether the timing of the conduct permits an inference of a causal connection between a protected act and an act of retaliation. In Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998), the court considered a thirteen-month interval between the employee's charge and his alleged retaliatory termination. "A thirteen month interval between the charge and termination is too long to establish causation absent other evidence of retaliation." A similar result was reached by the Eleventh Circuit Court of Appeals in Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir.1999), where the court found that intervening time periods of fifteen and twenty-one months "were isolated events that *250 had no temporal relationship to Appellant's protected activity. The more than 15-month period that elapsed between Appellant's grievance and the alleged adverse employment actions belies her assertion that the former caused the latter."
Here, the time between the player's grievance and her discharge from the team exceeded a year. In fact, Ms. Smith played for the team during the intervening season. Because there was no other competent admissible evidence of retaliation adduced in the administrative hearing, the ALJ's finding of no retaliatory conduct was correct; the agency's conclusion to the contrary was error as it was based on the EOA investigative report and not on competent or substantial evidence.
The final evidentiary factor is the significance of the individual players' interviews. The meeting between Coach Winters and Ms. Smith lasted over four hours and was attended by an assistant coach and by Hiram Green, an athletic department employee. As previously noted, neither Mr. Green nor Ms. Smith testified before the ALJ. This assumes a greater importance because the ALJ found that the tape recordings were of poor quality. Nevertheless, from those inadequate tapes the agency concluded that the long duration of the Winters/Smith interview when compared to the shorter duration of the interviews of players who had not complained about the coach was evidence of the interview's unreasonable nature, and, thus, that the coach acted unreasonably toward the player. Because this conclusion flows from the weight to be given the testimony, the agency was without authority to reject the ALJ's evidentiary finding, and thus we set aside the agency's finding on retaliation.
The second issue is whether the agency erred in concluding that Ms. Winters' responses to the university investigation were dishonest. As recently stated,
[a] reviewing court may set aside agency action when it finds that the action is dependent on any finding of fact that is not supported by competent substantial evidence in the record, a material error in procedure, an incorrect interpretation of the law, or an abuse of discretion.
Gross v. Dep't of Health, 819 So.2d 997, 1002 (Fla. 5th DCA 2002). After carefully scrutinizing the record and applying this standard, we affirm the final agency action in this regard.
The remaining issue is the propriety of the agency's rejection of the ALJ's recommendation that Ms. Winters be reinstated to her position because her conductsupplying the university with dishonest answers in the EOA investigation was not sufficient to warrant termination of her employment. USF correctly asserts that the determination of whether conduct constituting a breach of the employment contract is grounds for termination is within the reviewing agency's authority. On issues of law, an agency is not required to defer to the administrative law judge. State Contracting & Eng'g Corp. v. Dep't of Transp., 709 So.2d 607, 609 (Fla. 1st DCA 1998). Thus, where the matter under review "is infused with overriding policy considerations, the issue should be left to the agency." Pillsbury v. State, Dep't of Health & Rehabilitative Servs., 744 So.2d 1040, 1042 (Fla. 2d DCA 1999).
In these situations the agency should decide personnel decisions such as whether to terminate employment or to impose other lesser punishment for a breach of contract or other employment standards. Here, the parties bargained for a contract provision that mandated honesty and candor in university matters. Section 8.c.(5) of the contract, as found by the ALJ, provides that any fraud or dishonesty in the performance of coaching duties, including falsifying any report or record required *251 by the university, constitutes "cause," which is a basis to terminate the contract. This falls within the sphere of policy, and it is the university's prerogative to exercise its discretion and impose what it deems to be appropriate disciplinary action, including employment termination. Therefore, we hold that the agency did not err in concluding that "as a matter of policy, based upon the public trust obligations of public employees, this Agency holds that Petitioner's actions in falsifying those answers are grounds for termination. As a result, cause, as defined by Petitioner's employment contract, existed for USF to terminate the contract."
The agency's final decision concludes, in part, that "for the reasons herein discussed, the Agency hereby finds that cause did exist for USF to terminate the employment contract of women's basketball coach, Jerry Ann Winters." Because it appears that the agency's decision to terminate the contract rested upon both "reasons "retaliation and dishonestywe are unable to ascertain whether the same discretionary sanction would have been imposed by the agency on the sole ground upheld by this court. We recognize that the severity of Ms. Winters' penalty may transcend this case and affect other university personnel decisions. Therefore, in light of the language in the final agency decision, we remand for further proceedings for the agency to determine the appropriate action consistent with this court's determination that only one basis for cause has been established.
Affirmed in part, reversed in part, and remanded.
STRINGER and SILBERMAN, JJ., Concur.
NOTES
[1] In this appeal we will refer to the University of South Florida in its capacity as a party as "USF" or "the university." The University of South Florida is also the agency that reviewed the administrative law judge's recommended order, and we will refer to the university as "the agency" for its actions in that capacity.
[2] Ms. Smith did not state at this meeting that her dismissal from the team was related to her filing a complaint against the coach a year earlier.
[3] Had these witnesses been called, the ALJ would have had an opportunity to measure their credibility and perhaps make further findings of fact. The believability of a witness is often determined after cross-examination. For example, the record includes allegations that Ms. Smith had threatened another team member with physical violence after the team member had met with USF athletic department officials and that Ms. Smith had undermined the coach's authority. Unfortunately, as Ms. Smith was never called to testify, neither the allegations nor her responses could be evaluated by the ALJ.